1  Craig A. Brandt (SBN 133905)
LAW OFFICE OF CRAIG A. BRANDT
2  5354 James Avenue
Oakland, CA  94618
3  Telephone: (510) 601-1309
Email:  craigabrandt@att.net
4
Attorney for Plaintiff
5  EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

6                    UNITED STATES DISTRICT COURT

7                  NORTHERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>        vs.<br><br>MANTREX INC., dba WIT SALES & REFINING, a California corporation, and DOES 1-10, inclusive,<br><br>                    Defendant. | Case No:  _____<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

16         Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby

17  brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the

18  Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

19                            **INTRODUCTION**

20    1.    This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and

21  remediation against Defendant for current and ongoing violations of the National Pollutant

22  Discharge Elimination System ("NPDES") permit requirements of the CWA.

23    2.    On or about December 14, 2021, EDEN provided a Notice of Defendant's violations to

24  Defendant Mantrex Inc., dba WIT Sales & Refining ("WIT SALES"), by certified mail, at 538

Phelan Avenue, San Jose, California, ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.   On or about December 14, 2021, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, and (3) Executive Director of the State Water Resources Control Board ("State Board").

4.   A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit A and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

5.   More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendant, the State Water Resources Control Board ("State Board"), and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(g).

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

6.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

7.   The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016).)

8.   By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

9.   Venue is proper because Defendant reside in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Facility's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

10.   Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California as a limited liability company on June 1, 2018.  EDEN previously existed as an unincorporated environmental citizen's association, with members who remain associated with EDEN as of the date of the filing of this Complaint.

11.   EDEN's organizational purpose is the protection, preservation and enhancement of California's waterways.  Its mission is implemented by enforcing the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress from environmental harms caused by Industrial Dischargers who pollute the Waters of the United States, through community education and citizen suit enforcement when necessary.

12.    EDEN's members donate their time and money resources to protect, enhance, and assist in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their tributaries located in California.

13.    EDEN has members that reside, work and pursue recreational activities near the affected Receiving Waters. Defendant WIT SALES discharges storm water into a municipal storm drain system then to the Guadalupe River-Front San Francisco Bay Estuaries, a tributary of the San Francisco Bay which is the "Receiving Waters" for the Facility. Eden members use those waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing, swimming, hiking, photography, nature walks and scientific study. Their use and enjoyment of these natural resources have been and continue to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

14.    EDEN has standing as an association to bring this suit against Defendant, as at least one of EDEN's current members is experiencing ongoing and continuing harm particular to him or her as a specific result of Defendant's violations of the CWA, and the resulting adverse effects to the environment and the Receiving Waters downstream from the Facility, and has experienced such harm since at least the date that EDEN provided to Defendant a 60-day Notice of Intent to Sue.

15.    Specifically, the individual member(s) who are experiencing harm from Defendant's violations of the CWA are reluctant to utilize the Receiving Waters downstream from the Facility as specified in Paragraph 13, above, due to the pollution caused by Defendant's environmental violations that EDEN's members believe has entered into the Facility's Receiving

Waters; and the aesthetic and recreational interests of these members has been adversely

impacted.

16.    Defendant's ongoing violations of the California Industrial General Permit and the CWA

have and will continue to cause irreparable harm to EDEN and certain of its current members,

for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the

ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief

requested in this Complaint will not require the participation in this lawsuit of individual

members of EDEN.

17.    EDEN is informed and believes, and on such information and belief alleges, that

Defendant WIT SALES located at 538 Phelan Avenue, San Jose, California, was formed on or

about January 1, 1999, as a California corporation.

18.    EDEN is informed and believes, and on such information and belief alleges, that,

Defendant WIT SALES, on or about October 21, 1996, submitted a Notice of Intent ("NOI") to

be authorized to discharge storm water from the Facility. EDEN is further informed and believes,

and on such information and belief alleges, that on or about December 22, 2015 Defendant WIT

SALES, submitted an NOT to be authorized to discharge storm water from the Facility under the

California Industrial General Permit ("General Permit") and was assigned Waste Discharger

Identification number ("WDID") 2 431012622, according to the Regional Water Board's

records.

### STATUTORY BACKGROUND

19.    Congress declared that the Federal Clean Water Act was designed to "restore and

maintain the chemical, physical, and biological integrity of the Nation's waters" through federal

1    and state cooperation to develop and implement "programs for preventing, reducing, or

2    eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

3    20.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant

4    into waters of the United States, unless such discharge is in compliance with various enumerated

5    sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by,

6    or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33

7    U.S.C. § 1342.

8    21.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial

9    storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved

10   NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water

11   discharges through individual permits issued to dischargers or through the issuance of a single,

12   statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. §

13   1342(p).

14   22.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA

15   has authorized California's State Board to issue NPDES permits including general NPDES

16   permits in California.

17   General Permit

18   23.     The State Board elected to issue a statewide general permit for industrial storm water

19   discharges. The State Board originally issued the General Permit on November 19, 1991, and

20   modified it on September 17, 1992.  The State Board reissued the General Permit on April 17,

21   1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section

22   402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between

23

24

1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit

maintains or makes more stringent the same requirements as the 1997 Permit.

24.     In order to discharge storm water lawfully in California, industrial dischargers must

comply with the terms of the General Permit or have obtained and complied with an individual

NPDES permit. 33 U.S.C. § 1311(a).

25.     The General Permit contains several prohibitions. Effluent Limitation Section V.A of the

General Permit requires dischargers to reduce or prevent pollutants in their storm water

discharges through implementation of the Best Available Technology Economically Achievable

("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control

Technology ("BCT") for conventional pollutants.  Discharge Prohibition Section III.C of the

General Permit prohibits storm water discharges and authorized non-storm water discharges that

cause or threaten to cause pollution, contamination, or nuisance.

26.     Receiving Water Limitation Section VI.B of the General Permit prohibits storm water

discharges to any surface or ground water that adversely impact human health or the

environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D

of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any

applicable water quality standards contained in Statewide Water Quality Control Plan or the

applicable Regional Board's Basin Plan.

27.     In addition to absolute prohibitions, the General Permit contains a variety of substantive

and procedural requirements that dischargers must meet.  Facilities discharging, or having the

potential to discharge, storm water associated with industrial activity which have not obtained an

individual NPDES permit must apply for coverage under the State's General Permit by filing a

Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

28.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

29.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X.B.

30.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I .1.

31.     Sections X.D – X.I of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

32.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X.H.2.  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

33.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X.H.4, 5.

34.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

35.     As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

36.     Section XI.B of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

37.    A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI.B.2.

38.    Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit Section XI.B.4.

39.    Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, Section XI.A.

40.    The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, Section XV.

41.    Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI.B.6.c.

42.    The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water

1  discharge could potentially impair, or contribute to impairing, water quality, or affect human

2  health from ingestion of water or fish.

3  43.    The Numeric Action Levels ("NALs") in the General Permit are derived from these

4  benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP

5  benchmark values, and instantaneous maximum NALs, which are derived from a Water Board

6  dataset.

7  44.    The following annual NALs have been established under the General Permit for pollution

8  parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended

9  solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

10  45.    An exceedance of an annual NAL occurs when the average of all samples obtained for an

11  entire facility during a single reporting year is greater than a particular annual NAL. The

12  reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs

13  when two or more analytical results from samples taken for any single parameter within a

14  reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside

15  of the instantaneous maximum NAL range for pH.  General Permit Section XII.A.

16  46.    When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which

17  requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable

18  NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section

19  XII.C.

20  47.    For Level 2 Status, a discharger is required to submit an Action Plan requiring a

21  demonstration of either additional BMPs to prevent exceedances, a determination that the

22  exceedance is solely due to non-industrial pollutant sources, or a determination that the

23

24

exceedance is solely due to the presence of the pollutant in the natural background.  General

Permit Section XII.D.

48.    Section XVI.A. of the General Permit requires that all Dischargers must certify and

submit via SMARTS an Annual Report no later than July 15th following each reporting year

using the standardized format and checklists in SMARTS.

49.    Furthermore, Section XXI.L of the General Permit provides that all documents submitted

to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible

Person ("LRP") or Duly Authorized Representative ("DAR") of the Facility, with the following

certification:

"I certify under penalty of law that this document and all Attachments were prepared
under my direction or supervision in accordance with a system designed to assure that qualified
personnel properly gather and evaluate the information submitted. Based on my inquiry of the
person or persons who manage the system or those persons directly responsible for gathering the
information, to the best of my knowledge and belief, the information submitted is, true, accurate,
and complete. I am aware that there are significant penalties for submitting false information,
including the possibility of fine and imprisonment for knowing violations."

50.    Section XXI.N of the General Permit provides that any person who knowingly makes any

false material statement, representation, or certification in any record or other document

submitted or required to be maintained under the General Permit, including reports of

compliance or noncompliance shall upon conviction, be punished by a fine of not more than

$10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act

section 309(c)(4)

San Francisco Bay Regional Basin Plan

51.    The Water Quality Control Board, San Francisco Bay Region has adopted the "San

Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by

1    Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and

2    beneficial uses for San Francisco Bay and its tributaries.

3    52.    The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish

4    harvesting, fish migration, preservation of rare and endangered species, fish spawning,

5    commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving

6    contact with water, recreational activities involving proximity to water, and navigation. *See*

7    Basin Plan, Table 2-1.

8    53.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin

9    Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water

10    Act, 33 U.S.C. § 1313(d).

11    54.    Polluted discharges from industrial sites, such as the Facility, contribute to the

12    degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges

13    of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the

14    waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water

15    Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for

16    Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

17    55.    The Basin Plan sets forth, among other things, narrative WQS for floating material, Oil &

18    Grease, sediment, settleable matter, and suspended materials, and sets forth numeric WQS for

19    pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium, silver,

20    tributyltin, zinc, and hydrocarbons ("PAHs"). *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-

21    3.3.14, 3.3.21, and Table 3-3.

22    56.    The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for

23    specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan,

24

1  Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment

2  in the State of California.

3  57.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards,

4  and/or other applicable WQS are violations of Receiving Water Limitations in Section VI.A of

5  the General Permit.

6  <u>Water Quality Impairment Area</u>

7  58.    The San Francisco Bay is listed for water quality impairment on the most recent Section

8  303(d) - list of the General Permit for the following: chlordane; dichlorodiphenyltrichloroethane

9  (DDT); dieldrin; dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan

10  compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like);

11  selenium, and trash.

12  <u>Citizen Suit Provision of the CWA</u>

13  59.    Under the CWA, any citizen may commence a civil action against any person who is

14  alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued

15  by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be

16  commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to

17  the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any

18  alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a

19  citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the

20  CWA would be enforced, either by the United States government or by concerned citizens.

21  60.    In furtherance of the water preservation goals established by the CWA, the citizen suit

22  provision confirms the district court's jurisdiction to apply any appropriate civil penalties under

23  section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any

24

1   permit condition or limitation implementing any of such sections in an NPDES permit shall be

2   subject to a civil penalty not to exceed $46,192 per day for each violation occurring before

3   November 2, 2015, and $51,570.00 per day per violation for violations occurring after November

4   2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

5   61.   Violations of provisions of the General Permit, including those detailed below, constitute

6   violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§

7   1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

8                **FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS**

9   62.   Defendant WIT SALES is part of the industry that is primarily engaged in recovering

10   nonferrous metals and alloys from new and used scrap, including printed circuit boards and their

11   components, as well as, engaged in both the recovery and alloying of precious metals through

12   secondary smelting and refining and by use of chemical processes.

13   63.   EDEN is informed and believes that the Facility falls primarily within the standard

14   industrial classification ("SIC") Code 5093 - Scrap and Waste Materials which includes

15   establishments primarily engaged in assembling, breaking up, sorting, and wholesale distribution

16   of scrap and waste materials, including nonferrous metals scrap-wholesale. The General Permit

17   requires establishments designated under SIC Code 5093 to test for the following analytical

18   parameters: Iron (Fe), Lead (Pb), Aluminum (Al), Zinc (Zn), and Chemical Oxygen Demand

19   (COD). *See*, Table 2, of the General Permit.

20   64.   EDEN is informed and believes that the Facility falls secondarily within SIC Code

21   3471 -   Electroplating, Plating, Polishing, Anodizing, and Coloring which includes

22   establishments primarily engaged in all types of electroplating, plating, anodizing, coloring,

23   and finishing of metals and formed products for the trade. The General Permit requires

24

1    establishments designated under SIC Code 3471 to test for the following analytical

2    parameters: Zinc (Zn), Nitrate + Nitrite Nitrogen (N+N), Iron (Fe), and Aluminum (Al). *See*,

3    Table 2, of the General Permit.

4    65.    According to the EPA's Stormwater Discharge Mapping Tools the Facility discharges

5    stormwater into a municipal storm drain system then to the Guadalupe River-Front San

6    Francisco Bay Estuaries, a tributary of the San Francisco Bay. *See*, EPA's Stormwater Discharge

7    Mapping Tools, *available at https://www.epa.gov/npdes/epas-stormwater-discharge-mapping-*

8    *tools*. However, it is also possible that after the stormwater discharges from the Facility they

9    enter the municipal storm drain system and flows to nearby Coyote Creek which then empties

10   into the San Francisco Bay. *See*, Google Maps, *available at https://www.google.com/maps/*

11   *place/ Coyote+Creek*. Nevertheless, both discharge paths empty into the South San Francisco

12   Bay which is the "Receiving Waters" for the Facility.

13   66.    EDEN is informed and believes that Defendant WIT SALES stores industrial materials

14   outdoors that can be exposed to storm water, eroded by wind, and otherwise contaminate the

15   surrounding watershed.

16   67.    EDEN is informed and believes that based on its investigation, including a review of the

17   Regional Water Board's records and aerial photography storm water is collected and discharged

18   from the Facility through a series of channels that discharge via at least one outfall.  The outfall

19   discharges storm water and pollutants contained in that storm water that eventually discharges

20   into the San Francisco Bay, a navigable Water of the United States.

21   68.    Plaintiff is informed and believes, and thereupon alleges that the storm water flows over

22   the surface of the Facility where industrial activities occur and areas where airborne materials

23   associated with the industrial processes at the facility may settle onto the ground.  Plaintiff is

24

informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water channels.

69.   On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Defendant's was Late in its Reapplication for the NPDES Permit Coverage

70.   The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26.  The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System ("NPDES") storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the General Permit.

71.   WIT SALES was required to apply for coverage under the General Permit in order to commence business operations, pursuant to Section I.Q of the General Permit. According to California Secretary of State records, WIT SALES commenced its operations at the site on or before January 1, 1999.

72.   WIT SALES was covered under the 1997 Industrial General Order, which expired on June 30, 2015, and was replaced by the 2014 Industrial General Permit, which became effective on July 1, 2015.  In order to continue regulatory coverage under the new Permit, WIT SALES was required to complete a recertification process on or before August 14, 2015.  On

information and belief, Plaintiff alleges the Regional Water Board issued two separate Notices of Noncompliance to the Facility, WIT SALES for failing to recertify for General Permit coverage and was subsequently terminated from the program, effective August 15, 2015.

73.    On information and belief, Plaintiff alleges WIT SALES did not in fact re-apply for coverage until December 22, 2015. Thus, between at least August 15, 2015 and December 22, 2015, WIT SALES operated without NDPES Permit coverage.  On information and belief, Plaintiff alleges that during that time, WIT SALES did not comply with any of the terms of the Permit, including implementing Best Management Practices, collecting and analyzing storm water runoff for pollution parameters, preparing and implementing a Storm Water Pollution Prevention Plan, or filing Annual Reports.

74.    Permit noncompliance constitutes a violation of the Clean Water Act and the Water Code, is grounds for enforcement action against WIT SALES and is further a violation of Sections I and II.B.1.b of the General Permit.

Deficient SWPPP and Site Map

75.    On information and belief, Plaintiff alleges that since at least the beginning of the Facility's operations, Defendant WIT SALES has failed to develop an adequate SWPPP and a Site Map for the Facility as detailed in Plaintiff's 60-Day Notice attached hereto as Exhibit A and incorporated herein by reference. Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").

76.    On information and belief, EDEN alleges that the Facility has failed to upload an adequate revised SWPPP pursuant to Section X *et seq.* of the General Permit.

1

Monitoring and Reporting – Monthly Visual Observations

2    77.    On information and belief, EDEN alleges that Defendant WIT SALES do not have an

3   adequate storm water monitoring program at its Facility since at least the beginning of the

4   Facility's operations, as required by Section XI.A of the General Permit.

5    78.    On information and belief, EDEN alleges that Defendant has failed to conduct monthly

6   visual observations of storm water discharges at the Facility since at least the beginning of the

7   Facility's operations, as required by the General Permit.

8    79.    Information available to EDEN indicates that as a result of these practices, storm water

9   containing excessive pollutants is being discharged during rain events from the Facility to the

10   San Francisco Bay.

11

Failure to Collect and Analyze Storm Water Samples

12    80.    The Defendant WIT SALES required to collect and analyze two storm water samples

13   from the first half of the reporting year (July 1 to December 31) and two storm water samples for

14   the second half of the reporting year (January 1 to June 30), pursuant to Sections XI.B2 and

15   XI.B11.a of the General Permit.

16    81.    On information and belief, Eden alleges that Defendant WIT SALES failed to collect and

17   analyze the required number of storm water samples at the Facility since at least the beginning of

18   the Facility's operations, as required by the General Permit.

19    82.    On information and belief, EDEN alleges that during the 2015-2016 reporting year,

20   Defendant did not collect and analyze any storm water sample from the first half of the reporting

21   year.

22    83.    On information and belief, EDEN alleges that during the 2015-201 reporting year,

23   Defendant did not collect and analyze any stormwater from the second half of the reporting year.

24

84.    On information and belief, EDEN alleges that during the 2016-2017 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year.

85.    On information and belief, EDEN alleges that during the 2016-2017 reporting year, Defendant failed to collect and analyze one storm water samples from the second half of the reporting year.

86.    On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendant did not collect and analyze any storm water sample from the first half of the reporting year.

87.    On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendant failed to collect and analyze one storm water samples from the second half of the reporting year.

88.    On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendant did not collect and analyze any storm water sample from the first half of the reporting year.

89.    On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendant failed to collect and analyze one storm water sample from the second half of the reporting year.

90.    On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendant did not collect and analyze any storm water sample from the first half of the reporting year.

91.    On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendant did not collect and analyze any storm water samples from the second half of the reporting year.

92.    On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant did not collect and analyze any stormwater samples from the first half of the reporting year.

93.    On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant failed to collect and analyze one storm water sample from the second half of the reporting year.

94.    On information and belief, EDEN alleges that during the 2021-2022 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year.

*(A Chart of the above narration is provided for further reference)*

| Reporting Year | QSE's Sampled in First Half | QSE's Sampled in Second Half | |
|---|---|---|---|
| 2015-16 | 0 | 0 | |
| 2016-17 | 1 | 1 | |
| 2017-18 | 0 | 1 | |
| 2018-19 | 0 | 1 | |
| 2019-20 | 0 | 0 | |
| 2020-21 | 0 | 1 | |
| 2021-22 | 1 | n/a | |
| Total Sampled | 2 | 4 | |
| QSE's Required | 14 | 12 | |
| **QSE's Missing** | **12** | **8** | **20 Total** |

95.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

1

<u>Failure to Collect Storm Water Samples During Qualified Storm Events</u>

2    96.    On information and belief, EDEN alleges that Defendant has taken samples of storm

3    water discharges at the Facility that failed to comply with the General Permit's requirement that

4    storm water samples be preceded by a 48-hour period without a discharge, pursuant to Section

5    XI.B of the General Permit.

6    97.    On information and belief, EDEN alleges that Defendant's collection of storm water

7    samples on March 21, 2017 was not valid because it was made on the second consecutive day of

8    rainfall on that date in violation of the General Permit.

9    98.    On information and belief, EDEN alleges that Defendant's collection of storm water

10   samples on January 8, 2018 was not valid because it was made on the sixth consecutive day of

11   rainfall on that date in violation of the General Permit.

12   99.    On information and belief, EDEN alleges that Defendant's collection of storm water

13   samples on May 16, 2019 was not valid because it was made on the second consecutive day of

14   rainfall, in violation of the General Permit.

15   100.   On information and belief, EDEN alleges that Defendant's collection of storm water

16   samples on January 27, 2021 was not valid because it was made on the second consecutive day

17   of rainfall, in violation of the General Permit.

18   101.   Information available to EDEN indicates that as a result of these practices, storm

19   water containing excessive pollutants is being discharged during rain events from the Facility to

20   the San Francisco Bay.

21

22

23

24

1

<u>Failure to Deliver Stormwater Samples to a Laboratory Within 48 Hours of Collection</u>

2   102.   Defendant WIT SALES is required to deliver stormwater run-off samples to a qualified

3   laboratory within 48 hours of the date and time of physical sampling, pursuant to Attachment H,

4   Section 2 of the General Permit.

5   103.   On information and belief, EDEN alleges Defendant's stormwater sample taken on

6   December 23, 2016, was delivered to the laboratory eleven (11) days late, in violation of the

7   General Permit.

8   104.   On information and belief, EDEN alleges Defendant's stormwater sample taken on

9   December 8, 2019, was delivered to the laboratory two (2) days late, in violation of the General

10   Permit.

11   <u>Failure to Report pH Correctly</u>

12   105.   The General Permit requires that field (on Site) storm water sample holding time for pH

13   analysis is fifteen (15) minutes and that samples sent to a laboratory for analysis that exceed that

14   time limit and are considered invalid pursuant to Section XI.C.2.a of the General Permit.

15   106.   On information and belief, EDEN alleges that some of Defendant's laboratory reports

16   showed evidence that the field (on Site) litmus testing for pH were not conducted within the 15-

17   minute holding time in violation of the General Permit.

18   107.   On information and belief, EDEN alleges that all of Defendant's laboratory reports for all

19   stormwater samples collected showed evidence that the litmus test for the Facility's pH was not

20   conducted within the required fifteen (15) minute holding time.

21   108.   Information available to EDEN indicates that as a result of these practices, storm

22   water containing excessive pollutants is being discharged during rain events from the Facility to

23   the San Francisco Bay.

24

1

<u>Failure to Upload Stormwater Sample Analyses Within 30 Days</u>

2 109.    Defendant WIT SALES is required to submit sampling and analytical test results for all

3 stormwater sampling by uploading the data into the SMARTS system within thirty (30) days,

4 pursuant to Section XI.B.11 of the General Permit.

5 110.    On information and belief, EDEN alleges that Defendant failed to upload into SMARTS

6 all storm water sampling and analytical results within thirty (30) days, a violation of the General

7 Permit. The following chart demonstrates the approximate number of days Defendant was late

8 uploading storm water samples. The chart calculations are as of the date of Plaintiff's 60-Day

9 Notice.

10

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Length of Time Late |
|---|---|---|---|
| 12/23/2016 | 01/19/2017 | 06/05/2017 | 107 |
| 03/21/2017 | 04/10/2017 | 06/05/2017 | 26 |
| 01/08/2018 | 01/26/2018 | 06/21/2018 | 116 |
| 05/16/2019 | 05/31/2019 | 07/11/2019 | 11 |
| 01/27/2021 | 02/11/2021 | 06/11/2021 | 90 |

15

<u>Failure to Analyze Stormwater Samples for Additional Parameter of Mercury</u>

16 111.    Defendant WIT SALES is required to analyze for any additional parameters identified in

17 the pollutant source assessment contained in the Facility's SWPPP, pursuant to Section XI.B.6.c,

18 of the General Permit. The Facility's SWPPP indicates both Diazinon and Mercury are additional

19 parameters that shall be included in the sampling process, as they are associated with the

20 Facility's industrial operations.

21 12.    Section XI.B.6.e of the General Permit requires Defendant to analyze for any additional

22 applicable industrial parameters related to receiving waters with 303(d) listed impairments or

23

24

1    approved Total Maximum Daily Loads (TMDLs) based on the assessment in Section X.G.2.a.ix,

2    of the General Permit.

3    113.    Except for where site-specific objectives have been adopted, numeric water quality

4    objectives applicable to the Receiving Waters are those contained in the California Toxics Rule,

5    which are incorporated into and enforced through the Basin Plan. *See*, Basin Plan, Table 3-3

6    notes a and b; Table 3-4 notes a and b.

7    114.    Stormwater discharges with pollutant concentrations that exceed levels contained in

8    applicable water quality standards are violations of the General Permit and CWA. *Kramer*, 619

9    F. Supp. 2nd at 926-27; *see also, Defenders of Wildlife v. Browner*, 191 F. 3d 1159, 1166-67 (9th

10   Cir. 1999) (industrial stormwater discharges must strictly comply with water quality standards).

11   115.    The Guadalupe River is impaired for both Diazinon and Mercury and according to the

12   pollutant source assessment in the Facility SWPPP, these parameters are likely to come in to

13   contact with stormwater and thus, are likely to contribute to the impairment of the Guadalupe

14   River.

15   116.    On information and belief, EDEN alleges Defendant recovers and refines precious metals

16   from e-waste including printed circuit boards at its Facility and that said materials contain high

17   concentrations of Mercury.

18   117.    On information and belief, EDEN alleges Defendant failed to sample for Mercury and

19   Eden has reason to believe Defendant has discharged Mercury in excess of the Water Quality

20   Objectives for the San Francisco Bay.

21   118.    On information and belief, EDEN alleges Defendant has caused and contributed to an

22   exceedance of the water quality standards for Mercury and has exceeded the TAD for Mercury.

23   119.    Information available to EDEN indicates that as a result of these practices, storm

24

water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Conduct an Assessment of Potential Pollution Sources and to Include it in the SWPPP for Additional Parameters of Cyanide, Nickel, Copper, and Lead

120.   Defendant WIT SALES is required to develop and implement a site-specific SWPPP containing a description of Potential Pollution Sources and an Assessment of Potential Pollution Sources, pursuant to Section X.A.4-5, of the General Permit. Defendant is further required to analyze all stormwater samples for additional parameters that have been identified as likely being present in the stormwater discharges at the Facility, pursuant to Section X.G.2.a.ii, of the General Permit.

121.   The Basin Plan also contains site-specific water quality objectives for cooper and nickel appliable to South San Francisco Bay. *See*, Basin Plan, Table 3-3A.

122.   On information and belief, EDEN alleges Defendant WIT SALES uses cyanide in its recovery and refining processes in order to recover gold and other precious metals from e-waste material, including circuit boards, and as such, is required to analyze all stormwater samples for the additional parameter of cyanide, pursuant to Section X.G.2.a.ii, of the General Permit.

123.   On information and belief, EDEN alleges Defendant generates, from its e-waste refining and shredding processes, nickel, copper and lead components, and as such, is required to analyze all stormwater samples for the additional parameters of nickel, copper and lead, pursuant to Section X.G.2.a.ii, of the General Permit.

124.   On information and belief, EDEN alleges Defendant's SWPPP does not include the parameters of cyanide, nickel, copper or lead, a violation of Section X.A.4-5. of the General Permit.

125.    On information and belief, EDEN alleges Defendant has not tested stormwater samples for cyanide and has not consistently tested for lead and TSS, a violation of Section X.G.2.a.ii, of the General Permit.

126.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Analyze Stormwater Samples Under All the Designated Parameters for SIC Code 5093 and SIC Code 3471

127.    Defendant's SWPPP identifies itself as an establishment falling under SIC Code 3471 and EDEN has identified Defendant as falling under SIC Code 3471 as a secondary primary Code.

128.    On information and belief, EDEN alleges Defendant has failed to analyze stormwater under all the requited parameters for SIC Code 3471.

129.    On information and belief, EDEN alleges Defendant failed to analyze stormwater samples under SIC Code 3471 for the parameters of Nitrate + Nitrite Nitrogen (N+N), Iron (Fe), and Aluminum (Al), a violation of the General Permit, Table 2.

130.    EDEN is informed and believes the Facility falls primarily within SIC Code 5093 - Scrap and Waste Materials, and as such, Defendant must analyze stormwater samples for the designated parameters under SIC Code 5093. Table 2, of the General Permit.

131.    On information and belief, EDEN alleges Defendant failed to analyze stormwater samples under SIC Code 5093 for the parameters of Iron (Fe), Aluminum (Al), and Chemical Oxygen Demand (COD), a violation of the General Permit, Table 2.

132.    Information available to EDEN indicates that as a result of these practices, storm

water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Collect Samples from all Discharge Locations

133.   Section XI.B.4 of the General Permit requires Defendant to collect samples from all discharge locations, regardless of whether the discharges are substantially similar. Defendant may analyze a combined sample consisting of equal volumes, collected from as many as four substantially similar discharge locations, provided that Defendant submits a Representative Sampling Reduction Justification form with its sample analysis, and the samples are combined in the laboratory in accordance with Section XI.C.5 of the General Permit.  Furthermore, Representative sampling is only allowed for sheet flow discharges or discharges from drainage areas with multiple discharge locations.

134.   According to Defendant WIT SALES' s current SWPPP and Site Map, the Facility contains five (5) discharge locations and four (4) of them are listed in the same manner with no numerical identification on the Site Map as "Drain → □."  One of the five (5) discharge locations has listed near it "***Sample Point***." Defendant's SWPPP states the Facility only samples from one discharge point "adjacent to LOCATION (4), which is on the side of the building." *See*, *Wit Sales and Refining*, 2015 *Storm Water Pollution Prevention Plan*, SAMPLE LOCATION, p. 20 of 24. (The Site Map does not refer to "LOCATION (4)".) Further, the various Laboratory Reports connected to the assorted Ad Hoc Monitoring Reports generated by Defendant only refer to one sample location.

135.   On information and belief, EDEN alleges Defendant has previously collected stormwater samples from a "[r]oof down spout" on four separate occasions. *See*, Notice of Violation, June

30, 2003, at p. 3. However, it is decidedly unclear from Defendant's SWPPP and Site Map which discharge location is for the down spout.

136.    On information and belief, EDEN alleges that earlier stormwater discharges coming from the down spout contained zinc and TSS levels that exceeded the benchmark value and annual NAL levels established by the EPA and the State Water Board's Basin Plan's criteria. *See*, Notice of Violation, 6/30/2003, Other Areas of Concern, at p. 4.

137.    On information and Belief, EDEN alleges Defendant is no longer collecting stormwater samples from the down spout discharge location, a violation of Section XI.B.4 of the General Permit and the water quality objectives of the Basin Plan. *See*, Basin Plan, Table 3-3 notes a and b; Table 3-4 notes a and b.

138.    On information and belief, EDEN alleges Defendant did not collect stormwater samples from all the required locations nor did Defendant submit a Representative Sampling Reduction Justification form with its sample analysis which is a violation of Section XI.C.5, of the General Permit.

139.    Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances and TSS are being discharged during rain events from the Facility to the San Francisco Bay.

Admission of Noncompliance and Invalid Responses for Failing to Collect and Analyze all Four (4) Stormwater Sample During a Reporting Year

140.    Section XI.B of the General Permit provides that the Facility must collect and analyze two stormwater samples in the first half of each reporting year (July 1 to December 31), and two samples in the second half of each reporting year (January 1 to June 30).

141.    If a Facility does not collect four (4) stormwater samples during a particular reporting year, the reporting requirements of the General Permit require the Facility to indicate "NO" to

Question NO. 3 on the Facility Annual Report and to provide an explanation for why the required number of samples were not collected. The explanation as to why they were unable to comply is to be provided in Attachment 1 to the Annual Report.

142.    Here, as discussed above, Defendant failed to collect and analyze twenty (20) of the required stormwater samples from 2015-16 reporting year to the present. Indeed, for two of those reporting years, 2015-15 and 2019-20, Defendant did no stormwater testing at all.

143.    For three (3) of the most recent reporting periods, Defendant has filed Annual Reports claiming the exact same "reason," word for word, for not being able to collect all the required stormwater samples. "*Less than the prescribed number of samples were taken because sample equipment was not always available during periods where storm events met the stipulated criteria for sampling.*" Annual Reports 2017-18, 2019-20, and 2020-21, Attachment 1, Explanation Question 3, at p. 5.

144.    Defendant repeatedly admits their own gross negligence in "equipment [was] not always available" during storm events. Fed. R. Evid. 801(d)(2)(D). Why Defendant cannot simply purchase the testing material beforehand and have them stored on site, is not explained in the Annual Reports. Defendants admission are either deliberate attempts at evading the General Permit collection and testing requirements or evidence of lack of training, a violation of Sections X.D.1 and X.H.f of the General Permit. In either case, Defendant's admissions of noncompliance and their invalid responses for failing to collect and analyze all four (4) stormwater samples during a reporting year is a violation of Section XI.B, of the General Permit.

145.    Records from the National Oceanic and Atmospheric Administration (NOAA), San Jose Station website/database confirm that during the reporting years 2015-16 to the present, there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or

1  within 12 hours of the start of regular business hours to allow Defendant to collect the requisite

2  number of samples.

3  146.    Further, there were other Facilities near the Defendant's Facility that were able to collect

4  the required number of storm water samples during the Reporting Years. One such nearby

5  establishment that was able to collect all its stormwater samples is Tom Lopes Distributing, Inc.

6  located at 1790 South 10th Street, San Jose, California. Waste Discharger Identification number

7  2 43I024111.

8  147.    Based on the foregoing, it is clear that Defendant intentionally made misleading

9  statements in their Annual Reports when they repeatedly indicated they had failed to collect the

10  required number of stormwater samples because "equipment [was] not always available."

11  148.    Information available to EDEN indicates that as a result of these practices, storm

12  water containing excessive pollutants is being discharged during rain events from the Facility to

13  the San Francisco Bay.

14       Failure to File Timely Annual Reports

15  149.    EDEN is informed and believes that Defendants have failed to comply with Section

16  XVI.A of the General Permit, which provides that Dischargers shall certify and submit by way of

17  SMARTS an Annual Report no later than July 15th following each reporting year.

18  150.    The Annual Report shall include a Compliance Checklist that indicates whether the

19  Discharger has addressed all the General Permit requirements; an explanation for any non-

20  compliance with the General Permit requirements, and an identification of all revisions made to

21  the SWPPP within the reporting year.

22  151.    On information and belief, Eden alleges that Defendants failed to file their Annual

23  Reports for the reporting years 2015-16 and 2016-17, in violation of the General Permit.

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION
Page 31

1

<u>Failure to Implement BAT/BCT and BMPs</u>

2      152.    EDEN is informed and believes that Defendant WIT SALES has failed, since at least the

3      beginning of the Facility's operations, to identify and implement Best Management Practices

4      ("BMPs") at its Facility that comply with the requirements of the General Permit for best

5      conventional treatment (BCT) for conventional pollutants, and best available technology (BAT)

6      for toxic and non-conventional pollutants. These technology-based pollution controls are

7      required to be implemented in a manner that reflects best industry practice considering

8      technological availability and economic practicability and achievability.  General Permit

9      Sections I.C, V.A.

10     153.    Information available to EDEN indicates that as a result of these practices, storm water

11     containing excessive pollutants is being discharged during rain events from the Facility to the

12     San Francisco Bay.

13          <u>Discharges of Contaminated Storm Water</u>

14     154.    Information available to EDEN indicates that unauthorized non-storm water discharges

15     occur at the Facility due to inadequate BMP development and/or implementation necessary to

16     prevent these discharges in violation of the General Permit.

17     155.    Due to the nature of the operations at the Facility, coupled with the documented lack of

18     proper BMP implementation and unauthorized non-storm water discharges, Defendant is

19     discharging storm water containing excessive levels of pollutants specific to their operation

20     during at least every significant local rain event.  These pollutants include storm water

21     contaminated with pH affected substances, oil & grease ("O&G"), total suspended solids

22     ("TSS"), lead (Pb), copper (Cu), nickel (Ni), and zinc (Zn). Other potential pollution sources at

23

24

the Facility that may exist, but have not been collected and analyze by Defendant are, Iron (Fe), Aluminum (Al), Nitrate + Nitrite Nitrogen (N+N), and Chemical Oxygen Demand (COD).

156.    For the Reporting Year 2016-17 the copper level detected at the Facility was measured at 0.018 mg/L which exceeded the annual NAL for copper of 0.0332 mg/L established by the General Permit.

157.    For the Reporting Year 2017-18, the copper level detected at the Facility was measured at 0.013 mg/L which exceeded annual NAL for copper of 0.0332 mg/L established by the General Permit.

158.    For the Reporting Year 2018-19, the copper level detected at the Facility was measured at 0.052 mg/L which exceeded the annual NAL for copper of 0.0332 mg/L established by the General Permit.

159.    For the Reporting Year 2016-17 the zinc level detected at the Facility was measured at 0.205 mg/L which exceeded the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

160.    For the Reporting Year 2017-18, the zinc level detected at the Facility was measured at 0.100 mg/L which exceeded the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

161.    For the Reporting Year 2018-19, the zinc level detected at the Facility was measured at 0.180 mg/L which exceeded the Water Quality Objectives for zinc of 0.09 mg/L established by the Basin Plan, Table 3-3 notes a and b.

162.    For the Reporting Year 2018-19, the nickel level detected at the Facility was measured at 0.12 mg/L which exceeded the Water Quality Objectives for nickel of 0.074 mg/L established by

the Basin Plan, Table 3-3 notes a and b. Concertation of nickel at 0.12 mg/L also exceed the Basin Plan's Site-Specific Water Quality Objectives of 0.0624 mg/l established by Table 3-3A.

163.    For the Reporting Year 2018-19, the TSS level detected at the Facility was measured at 104 mg/L which exceeded annual NAL for TSS of 100.00 mg/L established by the General Permit.

164.    Information available to EDEN indicates that as a result of these practices, stormwater containing excessive pollutants, including, but not limited to, pH affected substances and TSS are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Train Employees

165.    Sections X.D.1 and X.H.f of the General Permit requires all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

166.    Defendant's failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a satisfactory SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to comply with required storm water sampling and analysis procedures.

167.    On information and belief, Eden alleges that Defendant WIT SALES failed to appoint a Pollution Prevention Team and/or adequate train its pollution prevention team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

1  168.    Information available to EDEN indicates that as a result of these practices, storm water

2  containing excessive pollutants is being discharged during rain events from the Facility to the

3  San Francisco Bay.

4  169.    Information available to Plaintiff indicates that Defendant has not fulfilled the

5  requirements set forth in the General Permit for discharges from the Facility due to the continued

6  discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon

7  alleges, that all the violations alleged in this Complaint are ongoing and continuing.

8  **FIRST CAUSE OF ACTION**
   **Failure to Develop a Storm Water Pollution Prevention Plan**
9  **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

10  170.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

11  herein.

12  171.    The General Permit requires dischargers of storm water associated with industrial activity

13  to develop and implement a SWPPP and create a compliant Site Map.

14  172.    As outlined herein, Defendants have failed to develop and implement an adequate

15  SWPPP or Site Map for the Facility.

16  173.    Each day since at least the beginning of the Facility's operations, that Defendants failed

17  to develop an adequate SWPPP and Site Map for the Facility is a separate and distinct violation

18  of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

19  **SECOND CAUSE OF ACTION**
   **Failure to Develop a Monitoring and Reporting Program**
20  **(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

21  174.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

22  herein.

23

24

175.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

176.    As outlined herein, Defendant has failed to develop and implement a monitoring and reporting program for its Facility.

177.    Defendant's ongoing failure to develop and implement a monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

178.    Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**THIRD CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

179.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

180.    The General Permit's SWPPP requirements and Effluent Limitation Section V.A of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

181.    Defendant has failed to implement BAT and BCT at the Facility for pollutants of pH affected substances, Total Suspended Solids ("TSS") and Oil & Grease and other potentially un-monitored pollutants, in violation of Effluent Limitation Section V.A of the General Permit.

182.    Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

183.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

184.    Discharge Prohibition Section III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Section VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

185.    Plaintiff is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendant has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the General Permit.

186.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with the pollutants of pH affected substances, Total Suspended Solids ("TSS"), Oil & Grease (O&G) and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into San Francisco Bay.

187.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

188.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

189.    Every day since at least the beginning of Facility's operations, that Defendant has discharged and continues to discharge polluted stormwater from its Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.  These violations are ongoing and continuous.

### FIFTH CAUSE OF ACTION
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

190.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

191.    Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team who is then responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team

1    members to implement the SWPPP and conduct required monitoring when the regularly assigned

2    Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of

3    town business, or other absences).

4    192.    Section X.H.f of the General Permit also requires that each facility ensure that all of its

5    Pollution Prevention Team members implementing the various compliance activities of the

6    General Permit are properly trained in at least the following minimum requirements: BMP

7    implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

8    Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

9    193.    Since at least the beginning of Facility's operations, Defendant has failed to properly

10   train Facility employees and the designated members of its Pollution Prevention Team, which

11   has resulted in the General Permit violations alleged herein.

12

13                         **SIXTH CAUSE OF ACTION**
                 **Recovery Under the Catalyst Theory CCP §1021.5**

14   194.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth

15   herein.

16   195.    Under the substantive law of California, if a plaintiff is a catalyst in encouraging a

17   Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and

18   costs.  *Graham v. DaimlerChrysler Corp*., 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553

19   (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal. Dec. 2, 2004), 34 Cal.4th 604, 21

20   Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

21   196.    A requirement for recovery under the catalyst theory is that a plaintiff first advise the

22   Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this

23   case complied by providing both the catalyst and the written notice of the claim to Defendant

24   prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit A and

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION

incorporated herein by reference. Exhibit A, 60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").

197.     In the event Defendants allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

198.     Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

### RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.     Declare Defendant to have violated and to be in violation of the CWA;

2.     Issue an injunction ordering Defendant to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.     Enjoin Defendant from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.     Order Defendant to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.     Order Defendant to take appropriate actions to restore the quality of United States waters impaired by its activities at Defendant's Facility;

6.    Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.    Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

8.    Award such other and further relief as may be just and proper.


Dated:  March 4, 2022            Respectfully,


                                 By: _/s/ Craig A. Brandt_____
                                     Craig A. Brandt
                                     Attorney for Plaintiff