

# EDEN

*Eden Environmental Citizen's Group, LLC*

September 17, 2021

<u>Via US Mail, Certified</u>

Attn: Fred Rex
Title: Chief Executive Officer
Mantrex, Inc. dba W I T Sales & Refining
538 Phelan Ave
San Jose, CA, 95112

**Re:    60-Day Notice of Violations and Intent to File Suit Under the Federal Water
       Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of W I T Sales &
Refining:

This letter is being sent to you on behalf of Eden Environmental Citizen's Group, LLC
("EDEN") to give legal notice that EDEN intends to file a civil action against Mantrex, Inc. dba
W I T Sales & Refining ("Discharger" or "W I T Sales & Refining") and its corporate officers
and other legally responsible parties for violations of the Federal Clean Water Act ("CWA" or
"Act") 33 U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the W I T Sales & Refining
facility located at 538 Phelan Ave in San Jose, California ("the Facility" or "the site").

EDEN is an environmental citizen's group established under the laws of the State of
California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, wetlands,
vernal pools, and tributaries of California, for the benefit of its ecosystems and communities.

EDEN formally registered as a limited liability company (LLC) association with the
California Secretary of State on June 22, 2018; however, since at least July 1, 2014, EDEN has
existed as an unincorporated environmental citizen's association with members who remain
associated with EDEN as of the date of this Notice.

---



730 2nd St #3135                                    Santa Rosa, CA 95402
Telephone:  707-241-3529                    Email:  *edenenvcitizens@gmail.com*
Website:                                              **edenenvironmental.org**

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and described in Section II.B, below.  EDEN has members throughout California.  Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for surfing, kayaking, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against W I T Sales & Refining, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of W I T Sales & Refining to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN intends to file suit in federal court against the Discharger under CWA section 505(a) for the violations described more fully below.

## I.        THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("1997 Permit") and by Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around October 21, 1996 W I T Sales & Refining submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility.  On or around December 22, 2015, W I T Sales & Refining submitted an NOI to be authorized to discharge storm water from the Facility under the 2015 Permit. W I T Sales & Refining's assigned Waste Discharger Identification number ("WDID") is 2 43I012622.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, W I T Sales & Refining has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377; the General Permit, the Regional Water Board Basin Plan, the California Toxics Rule (CTR) 40 C.F.R. § 131.38, and California Code of Regulations, Title 22, § 64431.

## II.  THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is W I T Sales & Refining's permanent facility address of 538 Phelan Ave in San Jose, California.

W I T Sales & Refining Facility is an establishment primarily engaged in manufacturing primary metal products, not elsewhere classified, such as nonferrous nails, brads, and spikes, and metal powder, flakes, and paste.

Facility operations are covered under Standard Industrial Classification Code (SIC) 3399 – Primary Metal Products, NEC and SIC 3672 – Printed Circuit Boards.

Based on the EPA's Industrial Storm Water Fact Sheet for Sector F – Primary Metals Facilities, polluted discharges from operations at the Facility potentially contain pH affecting substances; galvanized, heavy and/or toxic metals (depending on Facility operations); total suspended solids ("TSS"); ammonia-N; cyanide; chemical oxygen demand (COD); biochemical oxygen demand (BOD); chlorinated solvents; and oil and grease ("O&G").  Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.   The Affected Receiving Waters

The Facility discharges into a municipal storm drain system, which then discharges to the Guadalupe River-Frontal San Francisco Bay Estuaries, a tributary of the San Francisco Bay ("Receiving Waters").

The San Francisco Bay is a water of the United States.  The CWA requires that water bodies such as the San Francisco Bay meet water quality objectives that protect specific "beneficial uses."  The Regional Water Board has issued the *San Francisco Bay Basin Water Quality Control Plan* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: commercial and sport fishing, estuarine habitat, fish migration, navigation, preservation of rare and endangered species, water contact and noncontact recreation, shellfish harvesting, fish spawning, and wildlife habitat.   Contaminated storm water from the Facility adversely affects the water quality of the San Francisco Bay watershed and threatens the beneficial uses and ecosystem of this watershed.

Furthermore, the San Francisco Bay is listed for water quality impairment on the most recent 303(d)-list for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

In addition, the Gudalupe River is listed for water quality impairment on the most recent 303(d)-list for the following: Diazinon, Metals Screen – Mercury.

Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.   *Late Application/Reapplication For NPDES Coverage*

The CWA prohibits storm water discharges without a permit. 33 U.S.C. § 1342; 40 C.F.R. § 122.26.  The General Permit regulates operators of facilities subject to coverage under the National Pollutant Discharge Elimination System (NPDES) storm water permit, as these operators discharge storm water associated with specific industrial activities identified by both industrial activity and SIC (Standard Industrial Classification) codes in Attachment A of the Permit.

W I T Sales & Refining's primary industrial activity is listed on Attachment A as an industrial activity subject to NPDES coverage.  Thus, the Facility was required to apply for coverage under the Permit in order to commence business operations, pursuant to Section I.Q of the Permit.

According to California Secretary of State records, W I T Sales & Refining commenced its operations at the site on or before October 21, 1996.

W I T Sales & Refining was covered under the 1997 Industrial General Order, which expired on June 30, 2015, and was replaced by the 2014 Industrial General Permit, which became effective on July 1, 2015.  In order to continue regulatory coverage under the new Permit, all Dischargers were required to complete a recertification process on or before August 14, 2015.  Notwithstanding that the Regional Water Board issued two separate Notices of Noncompliance to the Facility, W I T Sales & Refining failed to recertify for General Permit coverage and was terminated from the program, effective August 15, 2015.

W I T Sales & Refining did not in fact re-apply for coverage until December 22, 2015.  Thus, between at least August 15, 2015 and December 22, 2015, the Facility operated without NDPES Permit coverage.  During that time, the Facility did not comply with any of the terms of the Permit, including implementing Best Management Practices, collecting and analyzing storm water runoff for pollution parameters, preparing and implementing a Storm Water Pollution Prevention Plan, or filing Annual Reports.

Permit noncompliance constitutes a violation of the Clean Water Act and the Water Code, is grounds for enforcement action against the Facility and is further a violation of Sections I and II.B.1.b of the General Permit.

### B. *Deficient/Invalid SWPPP and/or Site Map*

W I T Sales & Refining's current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility are both inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as follows:

(a) The Site Map does not include the minimum required components for Site Maps as indicated in Section X.E of the General Permit.  Specifically, the Site Map fails to include the following:

    1) notes, legends, a north arrow and other data to ensure the map is clear, legible and understandable;

    2) the facility boundary;

    3) storm water drainage areas within the facility boundary and portions of any drainage area impacted by discharges from surrounding areas;

4) the flow direction of each drainage area; (*missing one drain flow direction*)

5) on-facility surface water bodies, if any;

6) areas of soil erosion, if any;

7) nearby water bodies such as rivers, lakes and creeks;

8) or municipal storm drain inlets that may receive the facility's industrial storm water discharges and authorized NSWDs;

9) locations of storm water collection and conveyance systems associated with discharge locations and direction of flow;

10) locations and descriptions of structural control measures that affect industrial storm water discharges, authorized Non Storm Water Discharges (NSWD's) and/or run-on, if any;

11) identification of all impervious areas of the facility, including paved areas, buildings, covered storage areas or other roofed structures;

12) locations where materials are directly exposed to precipitation and the locations where identified significant spills or leaks have occurred;

13) all areas of industrial activity subject to the General Permit.

(b) The SWPPP fails to include the **date of each SWPPP Amendment** (Section X.A.10);

(c) The SWPPP fails to document the facility's **scheduled operating hours**, including irregular operating hours (i.e. temporary, intermittent, seasonal, weather dependent) (Section X.D.2.d);

(d) The SWPPP fails to include an appropriate discussion of the **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a) (*does not specify where materials are received and shipped; does not specify the handling frequency);*

(e) The SWPPP fails to discuss in detail **Facility operations and all industrial processes** at the facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (X.G.1.a);

(f) The SWPPP fails to include an adequate description of **Potential Pollutant Sources** and narrative assessment of all areas of industrial activity with potential industrial pollutant sources, including Industrial Processes, Material Handling and Storage Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks, Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

(g) The **Minimum Best Management Practices** (BMPs) as indicated in the SWPPP are insufficient and do not comply with the minimum required categories as listed in the General Permit Section X.H.1. (*Missing the following: Preventive Maintenance, Material Handling and Waste Management, Erosion and Sediment Controls, Quality Assurance and Record Keeping*)

(h) The **Advanced BMP**s as identified in the SWPPP are inadequate to comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in the Facility's storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability, including Exposure Minimization BMPs, Storm Water Containment and Discharge Reduction BMPs or Treatment Control BMPs (Section X.H.2);

(i) The SWPPP fails to include a **BMP Summary Table** summarizing each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants and the BMPs being implemented (Section X.H.4 and X.H.5);

(j) The SWPPP fails to identify all **Non-Storm Water Discharges (NSWD**s) sources and drainage areas, including an evaluation of all drains (inlets and outlets) that identifies connections to the storm water conveyance system, and a description of how all unauthorized NSWDs have been eliminated (Section X.G.e);

(k) The SWPPP fails to include an appropriate **Monitoring Implementation Plan**, including an identification of team members assigned to conduct monitoring requirements, a description of all discharge locations, a discussion of Visual Observation procedures, justifications for alternative discharge locations, if any, procedures for field instrument calibration instructions, and an example Chain of Custody form to be used when handling and shipping water quality samples to the lab (Section X.I);

(l) The SWPPP fails to include an adequate discussion of the **Facility's receiving waters** (Section XI.B.6(e), Section X.G.2.ix);

(m) The SWPPP does not contain the proper **sampling parameters** for the Facility's SIC Code (Section XI.B.6.d, Table 1, Section XI); (*does not state which parameters the Discharger shall sample and analyze*)

(n) The SWPPP does not contain the proper **sampling parameters** that include all potential pollutants present at the facility due to its industrial operations and industrial materials present at the facility (Section XI.B.6); (*Heavy Metals are present at the Facility and should be included in the sampling parameters. At a minimum, Mercury should be included due to the Guadalupe River being impaired for that parameter and the likelihood of that pollutant being present in Facility operations*)

(o) The SWPPP does not contain the proper **sampling frequency information** (Section XI.B); (*Section D "Sampling and Analysis" contains incorrect QSE requirements*)

(p) The SWPPP fails to include an appropriate discussion of **Visual Observations** which must be performed at least once every calendar month (Section XI.A);

(q) The SWPPP fails to include detailed information about its **Pollution Prevention Team** (Section X.D);

(r) The SWPPP fails to discuss the **Annual Comprehensive Facility Compliance Evaluation** (Section X.A.9).

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

**C.** **_Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit_**

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations

Section XI(A) of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor and the source of any pollutants. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

EDEN believes that between September 1, 2016, and the present, W I T Sales & Refining has failed to conduct monthly and sampling visual observations pursuant to Section XI(A) of the General Permit.

2. Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that W I T Sales & Refining has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, an explanation must be included in the Annual Report.

As of the date of this Notice, W I T Sales & Refining has failed to upload into the SMARTS database system:

a.  Two storm water sample analyses for the time period July 1, 2015, through December 31, 2015;

b.  Two storm water sample analyses for the time period January 1, 2016, through June 30, 2016;

c.  One storm water sample analysis for the time period July 1, 2016, through December 31, 2016;

d.  One storm water sample analysis for the time period January 1, 2017, through June 30, 2017;

e.  Two storm water sample analyses for the time period July 1, 2017, through December 31, 2017;

f.  One storm water sample analysis for the time period January 1, 2018, through June 30, 2018; and

g.  Two storm water sample analyses for the time period July 1, 2018, through December 31, 2018.

h.  One storm water sample analysis for the time period January 1, 2019, through June 30, 2019;

i.  Two storm water sample analyses for the time period July 1, 2019, through December 31, 2019; and

j.  Two storm water sample analyses for the time period January 1, 2020, through June 30, 2020.

k.  Two storm water sample analyses for the time period July 1, 2020, through December 31, 2020; and

l.  One storm water sample analysis for the time period January 1, 2021, through June 30, 2021.

*(A Chart of the above narration is provided for further reference)*

| Reporting Year | QSE's Sampled in First Half | QSE's Sampled in Second Half | |
|---|---|---|---|
| 2015-16 | 0 | 0 | |
| 2016-17 | 1 | 1 | |
| 2017-18 | 0 | 1 | |
| 2018-19 | 0 | 1 | |
| 2019-20 | 0 | 0 | |
| 2020-21 | 0 | 1 | |
| Total Sampled | 1 | 4 | |
| QSE's Required | 12 | 12 | |
| **QSE's Missing** | **11** | **8** | **19 Total** |

In summary, the Discharger has failed to upload 11 samples during the first half of the Reporting Year and 8 samples during the second half of the reporting year for a total of 19 missing QSE's.

Furthermore, pursuant to data collected from the National Oceanic and Atmospheric Administration ("NOAA"), there were sufficient storm events occurring near 538 Phelan Ave in San Jose during Facility operating hours within the reporting years where required stormwater sample collections were missed to have allowed the Facility to collect at least the minimum number of storm water samples required by the General Permit.

3.  Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location."   Attachment C to General Permit-Glossary)

W I T Sales & Refining's samples collected as listed below are not in compliance with the General Permit because they were not collected during Qualified Storm Events as defined by the General Permit:

Station: **SAN JOSE INTERNATIONAL AIRPORT, CA US WBAN: 72494523293 (KSJC)**

| Sample Date | QSE Info |
|---|---|
| 03/21/2017 | Not a valid QSE – 2nd consecutive day of rainfall |
| 01/08/2018 | Not a valid QSE – 6th consecutive day of rainfall[1] |
| 05/16/2019 | Not a valid QSE – 2nd consecutive day of rainfall |
| 01/27/2021 | Not a valid QSE – 2nd consecutive day of rainfall |

4.  <u>Failure to Deliver Samples to a Laboratory within 48 Hours of Collection</u>

Pursuant to Attachment H, Section 2 of the General Permit, Dischargers are to deliver storm water run-off samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.  W I T Sales & Refining's samples listed below were not delivered to the Facility's Laboratory in that time frame:

| Sample Date/Time | Date/Time Laboratory Received Sample | Days/Hours Late |
|---|---|---|
| 12/23/2016 | 01/05/2017 | 11 days |
| 01/08/2019 | 01/12/2018 | 2 days |

5.  <u>Failure to Sample Correctly for the Parameter of pH</u>

Pursuant to Section XI.C.2.a of the General Permit, the storm water sample "holding" time for pH analysis is 15 minutes.  *All* of W I T Sales & Refining's laboratory report(s) for *All* samples collected, showed evidence that the litmus test for the Facility's pH was not conducted within the required 15-minute holding time. In addition, there is no apparent evidence on the Laboratory Reports, or the Ad-Hoc Monitoring Data, showing any pH Field measurements were performed with either pH Test Strips, or a Calibrated pH Meter.

6.  <u>Failure to Report the Correct Parameter Test Method</u>

Table 2, Section XI.B.11 of the General Permit, specifies particular Test Methods for required sampling parameters, as listed below.

---

[1] There was a QSE on 01/03/2018. There were trace amounts of rainfall and measurable rainfall consecutively until 01/09/2018.

| PARAMETER | TEST METHOD |
|---|---|
| TSS | SM 2540-D |
| Oil & Grease | EPA 1664A |
| Zinc Total (H) | EPA 200.8 |
| Copper, Total (H) | EPA 200.8 |
| Lead, Total (H) | EPA 200.8 |
| COD | SM 5220C |
| Aluminum | EPA 200.8 |
| Iron | EPA 200.7 |
| Nitrate+Nitrite Nitrogen | SM 4500-NO3-E |
| Phosphorus | SM4500-P B+E |
| Ammonia (as N) | SM 4500-NH3 B+ C or E |
| Magnesium | EPA 200.7 |
| Cadmium | EPA 200.8 |
| Nickel | EPA 200.8 |
| Silver | EPA 200.8 |
| BOD | SM 5210B |

W I T Sales & Refining's Ad-Hoc Monitoring Data for *All* sample(s) collected, failed to correctly report the proper Test Method of SM 2540-D for TSS.

7.   Failure to Upload Storm Water Sample Analyses within 30 Days

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event. According to a publication by State Water Resources Control Board titled: *Discharger's Guide To The SMARTS Database – **Ad Hoc Monitoring Report**[2]*, an Ad Hoc Report is used to submit monitoring results through SMARTS. In addition, only the LRP or the DAR may certify and submit these reports. A Discharger must manually enter these results in the SMARTS system as referenced in the publication. It is not sufficient to simply upload laboratory reports.

[2] https://www.waterboards.ca.gov/water_issues/programs/stormwater/docs/dischargers_guide_adhocreport.pdf

W I T Sales & Refining failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Length of Time Late |
|---|---|---|---|
| 12/23/2016 | 01/19/2017 | 06/05/2017 | 107 |
| 03/21/2017 | 04/10/2017 | 06/05/2017 | 26 |
| 01/08/2018 | 01/26/2018 | 06/21/2018 | 116 |
| 05/16/2019 | 05/31/2019 | 07/11/2019 | 11 |
| 01/27/2021 | 02/11/2021 | 06/11/2021 | 90 |

8.   <u>Failure to Analyze Storm Water Samples for the Correct Parameters</u>

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type:  pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.    The Facility's SWPPP indicates the following additional parameters are to be included in the sampling process, as they are associated with the Facility's industrial operations: ***Diazinon; Mercury***.

Section XI.B.6.e of the General Permit requires Dischargers to analyze for any additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads (TMDLs) based on the assessment in Section X.G.2.a.ix.

The Guadalupe River is impaired for Diazinon and Mercury and according to the pollutant source assessment in the Facility SWPPP, these parameters are likely to come in to contact with stormwater and thus, are likely to contribute to the impairment of the Guadalupe River. The Discharger failed to sample for these parameters and Eden has reason to believe there have been discharges in excess of the Water Quality Objectives for the San Francisco Bay. In addition, Eden believes the Discharger has caused and contributed to an exceedance of the water quality standards for Diazinon and Mercury and has exceeded the TMDL for those parameters.

### D.  *Late-Filed Annual Report/Failure to File Annual Reports*

W I T Sales & Refining has failed to comply with Section XVI.A of the General Permit, which provides as follows: "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

W I T Sales & Refining's Annual Report for the reporting year 2015-16, 2016-17 was due on or before July 15, 2016, and 2017 respectively.  W I T Sales & Refining has failed to file the Annual Reports as of the date of this Notice.

### E.  *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that W I T Sales & Refining has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

W I T Sales & Refining's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

### F.  *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition Section III(B) of the General Permit prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States.  Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition Section III(B) of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

1.   Discharges in Excess of Technology-Based Effluent Limitations

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. (Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit.  The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (Section I.M. (Finding 62)).

W I T Sales & Refining's exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit.   EDEN alleges and notifies W I T Sales & Refining that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

W I T Sales & Refining's ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility. EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

W I T Sales & Refining's failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

**2.**   Discharges in Excess of Receiving Water Limitations

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations. Receiving Water Limitations found in Section VI(B) of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan. Exceedances of WQS are violations of the Industrial General Permit, the CTR, and the Basin Plan. Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan. (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the San Francisco Bay and its tributaries, including but not limited to the following:

- Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

- Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

- Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

- All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

- Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below.   These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters.  Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health.  These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

Further, EDEN puts W I T Sales & Refining on notice that the Receiving Water Limitations are independent requirements that must be complied with, and that carrying out the process triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Receiving Water Limitations.  The NALs do not represent water quality-based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a WQS, or whether it is causing adverse impacts to human health or the environment.

Section XX.B. of the General Permit provides that when a facility's industrial storm water discharges and/or authorized Non Storm Water Discharges (NSWD's) are determined to contain pollutants that are in violation of Receiving Water Limitations contained in Section VI, the Discharger must conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, assess its current SWPPP, and certify via SMARTS any additional BMPs identified which are necessary in order to meet the Receiving Water Limitations.

EDEN alleges that from at least to the present, W I T Sales & Refining has been in violation of the Receiving Water Limitations provision of Section VI of the General Permit, as evidenced by its exceedances of the applicable Water Quality Standards set forth in the Regional Basin Plan, indicated below.

Further, W I T Sales & Refining has failed to comply with Section XX.B of the General Permit.  Failure to comply with the additional Water Quality-Based Corrective Action requirements listed in Section XX.B is an additional violation of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions and Receiving Water Limitations of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Date | Parameter | Units | Result | IGP NAL average/ instantaneous Value[1] | Sample Location |
|---|---|---|---|---|---|
| 12/23/2016 | pH | SU | 6.81 | <6 or >9 | SW 1 |
| 12/23/2016 | Lead, Total | mg/L | 0.0019 | | SW 1 |
| 12/23/2016 | Copper, Total | mg/L | 0.021 | | SW 1 |
| 12/23/2016 | Nickel, Total | mg/L | 0.0051 | | SW 1 |
| 12/23/2016 | Total Organic Carbon (TOC) | mg/L | 3.74 | | SW 1 |
| 12/23/2016 | Zinc, Total | mg/L | 0.18 | | SW 1 |
| 12/23/2016 | Total Suspended Solids (TSS) | mg/L | 18 | 400 | SW 1 |
| 3/21/2017 | pH | SU | 6.8 | <6 or >9 | SW 1 |
| 3/21/2017 | Copper, Total | mg/L | 0.015 | | SW 1 |
| 3/21/2017 | Nickel, Total | mg/L | 0.002 | | SW 1 |
| 3/21/2017 | Total Organic Carbon (TOC) | mg/L | 4.9 | | SW 1 |
| 3/21/2017 | Zinc, Total | mg/L | 0.23 | | SW 1 |

**RY* 2016-2017 Averages**

| IGP Exceedance / Basin Plan / Both | Contaminant | Unit | Value | EPA Benchmark | Basin Plan (*1hr average*) |
|---|---|---|---|---|---|
| | Copper, Total | mg/L | **0.018** | 0.03 | 0.01 |
| | Lead, Total | mg/L | **0.002** | 0.26 | 0.21 |
| | Nickel, Total | mg/L | 0.00 | 1.02 | 0.06 |
| | pH | SU | 6.805 | <6 or >9 | n/a |
| | Total Suspended Solids (TSS) | mg/L | 18.00 | 100.00 | n/a |
| | Zinc, Total | mg/L | **0.205** | 0.26 | 0.09 |

| Sample Date | Parameter | Units | Result | IGP NAL average/ instantaneous Value[1] | Sample Location |
|---|---|---|---|---|---|
| 1/8/2018 | pH | SU | 3.7 | <6 or >9 | SW 1 |
| 1/8/2018 | Copper, Total | mg/L | 0.013 | | SW 1 |
| 1/8/2018 | Zinc, Total | mg/L | 0.1 | | SW 1 |
| 1/8/2018 | Nickel, Total | mg/L | 0.0016 | | SW 1 |

**RY\* 2017-2018 Averages**

| | Contaminant | Unit | Value | EPA Benchmark | Basin Plan (*1hr average*) |
|---|---|---|---|---|---|
| IGP Exceedance / Basin Plan / Both | Copper, Total | mg/L | **0.013** | 0.03 | 0.01 |
| | Nickel, Total | mg/L | 0.00 | 1.02 | 0.06 |
| | pH | SU | 3.700 | <6 or >9 | n/a |
| | Zinc, Total | mg/L | **0.100** | 0.26 | 0.09 |

| Sample Date | Parameter | Units | Result | IGP NAL average/ instantaneous Value[1] | Sample Location |
|---|---|---|---|---|---|
| 5/16/2019 | Zinc, Total | mg/L | 0.18 | | SW 1 |
| 5/16/2019 | Nickel, Total | mg/L | 0.12 | | SW 1 |
| 5/16/2019 | Copper, Total | mg/L | 0.052 | | SW 1 |
| 5/16/2019 | pH | SU | 6.4 | <6 or >9 | SW 1 |
| 5/16/2019 | Lead, Total | mg/L | 0.014 | | SW 1 |
| 5/16/2019 | Total Suspended Solids (TSS) | mg/L | 104 | 400 | SW 1 |

**RY\* 2018-2019 Averages**

| IGP Exceedance / Basin Plan / Both | Contaminant | Unit | Value | EPA Benchmark | Basin Plan (*1hr average*) |
|---|---|---|---|---|---|
| | Copper, Total | mg/L | **0.052** | 0.03 | 0.01 |
| | Lead, Total | mg/L | **0.014** | 0.26 | 0.21 |
| | Nickel, Total | mg/L | 0.12 | 1.02 | 0.06 |
| | pH | SU | 6.400 | <6 or >9 | n/a |
| | Total Suspended Solids (TSS) | mg/L | 104.00 | 100.00 | n/a |
| | Zinc, Total | mg/L | 0.180 | 0.26 | 0.09 |

In summary, the Discharger has exceeded the Basin Plan 1-hour average for Copper and Zinc for the 2016-17 RY, has exceeded the 1-hour average for Copper and Zinc for the 2017-18 RY, and has exceeded the 1-hour average for Copper, Zinc, and Nickel for the 2018-19 RY.

In addition, the Discharger has exceeded the NAL for TSS for the 2018-19 RY.

### G.  Failure to Comply with Exceedance Response Action Requirements

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   (Section XII(B)).

Pursuant to Section XII(C) of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous NAL exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA") process.  The ERA process requires the discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report.  (Section XII(C)(2)).  The Level 1 Report must be prepared by a QISP and include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed.  The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status.

A Discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

A Discharger will enter Level 2 status if there is an NAL exceedance of the same parameter occurring during the time the Discharger is in Level 1 status.

1.  Failure to Submit Level 1 ERA Report

Based on the sample data summarized above, the Facility exceeded the EPA Benchmark NAL for TSS for the reporting year 2018-19.  These results elevated W I T Sales & Refining to Level 1 Status on July 1, 2019, pursuant to Section XII.C – Exceedance Response Actions -- of the General Permit.

Pursuant to Section XII(C)(2) of the General Permit, the Facility was required to have a QISP conduct an evaluation of the Facility by October 1, 2019, and to upload an adequate Level 1 ERA Report on or before January 1, 2020.

As of the date of this Notice, EDEN alleges that W I T Sales & Refining has failed to conduct an adequate Level 1 status evaluation and has also failed to submit a Level 1 ERA report by uploading it into the SMARTS system.

### H. *Failure to Comply with Facility SWPPP*

Section "D." in "Storm Water Monitoring" of the Facility SWPPP indicates that the Facility will collect and analyze at least (4) sampling events.

As detailed above, the Facility missed collecting storm water samples in the reporting years 2015-16, 2016-17, 2017-18, 2018-19, 2019-20, and 2020-21.

### I. *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that W I T Sales & Refining has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

W I T Sales & Refining may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

### IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The entities responsible for the alleged violations are W I T Sales & Refining, as well as its corporate officers [*if a corporation or large company]* and employees of the Facility responsible for compliance with the CWA.

## V.  THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is from at least October 2016 to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.  CONTACT INFORMATION

The entity giving this 60-day Notice is Eden Environmental Citizen's Group ("EDEN").

Aiden Sanchez
EDEN ENVIRONMENTAL CITIZEN'S GROUP
730 2nd Street #3135
Santa Rosa, CA 95402
Telephone: (707) 241-3529
Email:  Edenenvcitizens@gmail.com  (emailed correspondence is preferred)
Website: edenenvironmental.org

EDEN has retained counsel in this matter as follows:

CRAIG A. BRANDT
Attorney at Law
5354 James Avenue
Oakland CA, 94618
Telephone:  (510) 601-1309
Email:  craigabrandt@att.net

To ensure proper response to this Notice, all communications should be addressed to EDEN's legal counsel, Mr. Craig A. Brandt.

## VII.  RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter. **These provisions of law authorize civil penalties of $37,500.00 per day per violation for all Clean Water Act violations after January 12, 2009, and $51,570.00 per day per violation for violations that occurred after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

**Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure §1021.5, EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred** (see *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017) 853 F.3d 1076; *Vasquez v. State of California* (2008) 45 Cal.4th 243).

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages W I T Sales & Refining's counsel to contact **EDEN's counsel** within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein.  Please do not contact EDEN directly.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if W I T Sales & Refining wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.  EDEN reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Very truly yours,

AIDEN SANCHEZ
Eden Environmental Citizen's Group

Copies to:



**EDEN**

*Eden Environmental Citizen's Group, LLC*

Michael S. Regan:  Regan.Michael@epa.gov
Administrator, U.S. Environmental Protection
Agency

Eileen Sobeck, Executive Director
State Water Resources Control Board
eileen.sobeck@waterboards.ca.gov

Mayumi Okamoto
State Water Board Office of Enforcement:
Mayumi.Okamoto@waterboards.ca.gov

California Water Boards Stormwater Program
stormwater@waterboards.ca.gov

Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov
Laurie Kermish:  kermish.Laurie@epa.gov

730 2nd Street #3135                    Santa Rosa, CA 95402
Telephone:  707-241-3529                    Email:  edenenvcitizens@gmail.com
Website:                    edenenvironmental.org

